# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3521

_____

| | | |
|---|---|---|
| Children's Healthcare Is A Legal Duty, Incorporated, a corporation under the laws of Iowa; Bruce Bostrom; Steven Petersen, | * * * * * | |
| | * | |
| Plaintiffs/Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| Nancy-Ann Min De Parle, in her official capacity as Director of Health Care Finance Administration, an agency of the United States; Donna Shalala, in her official capacity as Secretary of the United States Department of Health and Human Services, an agency of the United States, | * * * * * * * * | Appeal from the United States District Court for the District of Minnesota. |
| | * | |
| Defendants/Appellees, | * | |
| | * | |
| First Church of Christ, Scientist, in Boston, Massachusetts, | * * * | |
| | * | |
| Intervenor Defendant/ Appellee. | * * | |
| | * | |
| _____ | * | |
| | * | |
| American Academy of Pediatrics; The American Medical Association; The American Nurses Association; Iowa | * * * | |

Medical Society; Minnesota Civil       *
Liberties Union; The American          *
Humanist Association; Americans for    *
Religious Liberty; Council for Secular *
Humanism,                              *
                                       *
    Amici on behalf of Appellant,   *
                                       *
Senator Edward M. Kennedy,             *
                                       *
    Amicus on Behalf of Appellee,   *
                                       *
Christian Legal Society; National      *
Council of Churches of Christ in the   *
USA; Christian Medical and Dental      *
Society; The National Association of   *
Evangelicals; General Council on       *
Finance and Administration of the      *
United Methodist Church; Presbyterian  *
Church, (U.S.A.),                      *
                                       *
    Amici on Behalf of Appellee.    *

_____

Submitted: October 18, 1999

Filed: May 1, 2000
_____

Before WOLLMAN, Chief Judge, LAY and LOKEN, Circuit Judges.
_____

WOLLMAN, Chief Judge.

Section 4454 of the Balanced Budget Act of 1997 creates exceptions to the Medicare and Medicaid Acts for persons who have religious objections to the receipt

of medical care. These exceptions enable such individuals to receive government assistance for nonmedical care that they receive in facilities that, for religious reasons, administer only nonmedical services. Appellants Bruce Bostrom, Steven Peterson, and Children's Healthcare is a Legal Duty, Inc., utilizing taxpayer standing, filed suit in federal district claiming that section 4454 impermissibly establishes religion in violation of the First Amendment of the United States Constitution. The district court[1] found that section 4454 is a permissible accommodation of religion and thus does not transgress the Establishment Clause. We affirm.[2]

## I. Factual Background

In 1965, Congress enacted the Medicare Act, 42 U.S.C. §§ 1395 et. seq., and the Medicaid Act, 42 U.S.C. §§ 1396 et. seq., in an attempt to make health care more readily available to certain segments of the public. The Medicare Act creates a system of comprehensive health insurance for the disabled and the elderly. See 42 U.S.C. § 1395c. Funded by federal employment taxes, Medicare reimburses hospitals and skilled nursing facilities for the costs of providing hospital and post-hospital care to program beneficiaries. See 42 U.S.C. §§ 1395d(a), 1395f. The Medicaid Act, in contrast, provides medical assistance to low-income families with dependent children and to impoverished individuals who are aged, blind, or disabled. See 42 U.S.C. § 1396. Medicaid is jointly financed by the federal and state governments and is administered by the states, which must submit plans that meet broad statutory requirements in order to receive federal funding. See 42 U.S.C. §§ 1396, 1396(a).

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

[2]We grant appellants' motion to expand the record on appeal.

From their enactment until 1996, both the Medicare and Medicaid Acts contained express exceptions for members of the First Church of Christ, Scientist (Christian Scientists), a religious group that objects to medical care and embraces prayer as the sole means of healing. The exceptions sought to extend to Christian Scientists the nonmedical elements of Medicare- and Medicaid-funded services, and also to except Christian Science sanitoria, the facilities providing such care, from the Acts' medical oversight requirements. The exceptions remained in effect until August 7, 1996, when the United States District Court for the District of Minnesota declared them unconstitutional as facially discriminating among religious sects in violation of the Establishment Clause. See Children's Healthcare is a Legal Duty, Inc. v. Vladeck, 938 F.Supp. 1466, 1485 (D.Minn. 1996) (CHILD I).

In response to CHILD I, Congress enacted section 4454 of the Balanced Budget Act of 1997. Act of Aug. 5, 1997, Pub. L. No. 105-33, § 4454, 111 Stat. 251, 426-32. With section 4454, Congress sought to replace the sect-specific portions of the Medicare and Medicaid Acts "with a sect-neutral accommodation available to any person who is relying on a religious method of healing and for whom the acceptance of the medical health services would be inconsistent with his or her religious beliefs." H.R. Conf. Rep. No. 105-217, at 767 (1997). To achieve this end, Congress struck all references to "Christian Science sanitoria" contained within the Medicare and Medicaid Acts and replaced them with the phrase "religious nonmedical health care institutions" (RNHCIs). Congress then defined an RNHCI as an institution that, among other things, "provides only nonmedical nursing items and services exclusively to patients who choose to rely solely upon a religious method of healing or for whom the acceptance of medical health services would be inconsistent with their religious beliefs," and that "on the basis of its religious beliefs, does not provide . . . medical items and services . . . for its patients." 42 U.S.C. §§ 1395x(ss)(1)(C), (F).

Section 4454's incorporation of RNHCI terminology into the Medicare and Medicaid Acts enables individuals who hold religious objections to medical care to

receive government assistance for care that they receive at RNHCIs, and it also frees RNHCIs from all medically-based supervision. Section 4454 achieves these results under the Medicare Act through three primary provisions. First, section 4454 expressly includes RNHCIs within Medicare's definition of "hospital" and "skilled nursing facility," designations required for Medicare coverage, even though RNHCIs do not meet the technical criteria necessary to qualify as either of these facilities. See 42 U.S.C. §§ 1395x(e), 1395x(y)(1). Second, section 4454 provides that Medicare will pay for services rendered in an RNHCI if the recipient of the services has a condition such that the recipient would have been entitled to Medicare benefits if the recipient had received the same services in a medical facility. See 42 U.S.C. § 1395i-5(a)(2). Third, section 4454 exempts RNHCIs from the medical oversight requirements of 42 U.S.C. § 1320c, which establishes "peer review organizations" that oversee the services provided in facilities that qualify for Medicare funding. See 42 U.S.C. § 1320c-11.

Section 4454 accomplishes the same results under the Medicaid Act through two key provisions. First, it modifies the statutory requirements for state Medicaid plans when such plans relate to RNHCIs. See 42 U.S.C. § 1396a(a). For example, state plans may not establish state agency oversight of the quality of care provided in RNCHIs, nor may they require RNHCI utilization review committees, the in-house groups that review admissions decisions, to be composed of medical personnel. See id. Second, section 4454 excludes RNHCIs from Medicaid's definition of "nursing home," thereby exempting RNHCIs from state licensing requirements for nursing home administrators. See 42 U.S.C. § 1396g(e)(1).

In response to the enactment of section 4454, appellants brought the present action against the United States, contending that section 4454 violates the Establishment Clause both on its face and as applied to Christian Science sanitoria. The district court rejected appellants' claim, granting summary judgment in favor of the government and intervenor Christian Scientists. The court found that section 4454 does

not facially discriminate among religious sects and therefore is not subject to strict scrutiny review. The court then applied the less stringent standard of Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971), and concluded that section 4454 is a permissible accommodation of religion under the Establishment Clause. This appeal followed.[3]

We review the district court's grant of summary judgment de novo. See Henerey v. City of St. Charles, No. 98-3439, slip op. at 3 (8th Cir. Dec. 29, 1999). In so doing, we must decide whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

## II. Facial Challenge to Section 4454

In considering appellants' facial challenge, we initially must determine whether section 4454 discriminates among religious sects.[4] If so, we apply strict scrutiny

---

[3]Appellants also appeal the district court's denial of their motion to supplement the record with documents they obtained after the summary judgment filing deadline. Because appellants filed the motion at such a late time, less than ten days before the court issued its decision, and because we find the evidence cumulative of other evidence in the record, we conclude that the district court did not abuse its discretion in denying the motion. See Moad v. Arkansas State Police Dep't, 111 F.3d 585, 587 (8th Cir. 1997); Callanan v. Runyun, 75 F.3d 1293, 1297 (8th Cir. 1996).

[4]Intervenor Christian Scientists contend that appellants lack standing to assert a facial challenge to section 4454. We disagree. Although appellants' claim implicates equal protection concerns and thus would seem to make the standing requirements of equal protection cases applicable, appellants' claim ultimately challenges Congress's disbursement of funds under the Establishment Clause. Thus, we believe that appellants have standing to challenge section 4454 because there is a sufficient nexus between appellants' status as taxpayers and Congress's exercise of its taxing and spending power through the Medicare and Medicaid Acts. See Flast v. Cohen, 392

review under <u>Larson v. Valente</u>, 456 U.S. 228 (1982). If not, we administer the three-part test set forth by the Supreme Court in <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13 (1971). <u>See</u> <u>Hernandez v. Commissioner</u>, 490 U.S. 680, 695 (1989) (applying the <u>Lemon</u> test where no facial sect preference exists).

## A.

In <u>Larson</u>, the Supreme Court held that a law that on its face grants a denominational preference may be upheld only if it is supported by a compelling state interest. <u>See</u> 456 U.S. at 246-47; <u>Hernandez</u>, 490 U.S. at 695. To facially discriminate among religions, a law need not expressly distinguish between religions by sect name. <u>See</u> <u>Larson</u>, 456 U.S. at 232 n.3. Such discrimination can be evidenced by objective factors such as the law's legislative history and its practical effect while in operation. <u>See</u> <u>Church of the Lukumi Babalu Aye, Inc. v. Hialeah</u>, 508 U.S. 520, 535, 540 (1993); <u>Larson</u>, 456 U.S. at 254.

Citing these factors, appellants contend that section 4454 is "unmistakably targeted to Christian Science institutions" and thus is a denominational preference that is subject to strict scrutiny review. The district court rejected appellants' argument and refused to apply strict scrutiny. We agree. Section 4454, in our view, does not facially differentiate among religious sects, for its terms, legislative history, and effect all suggest denominational neutrality.

Section 4454 is by its terms sect-neutral. It does not include or disqualify any particular sect by name, but instead uses religiously neutral terms to define RNHCIs, <u>see</u> 42 U.S.C. § 1395x(ss)(1), and those persons who may receive Medicare and Medicaid coverage for care received in RNHCIs, <u>see</u> 42 U.S.C. § 1395i-5(b)(2)(A). Indeed, an individual may elect to receive Medicare- and Medicaid-funded services in

---

U.S. 83, 102-03 (1968).

an RNHCI simply by stating that he or she is "conscientiously opposed" to medical treatment and that such treatment is "inconsistent with his or her sincere religious beliefs." See id.

Section 4454's legislative history suggests that it is facially neutral among religions. Although Congress enacted section 4454 in response to CHILD I, appellants' characterization of section 4454 as nothing more than an attempt to "reinstate" to Christian Scientists the benefits invalidated in CHILD I is supported only by a selective and strained reading of the legislative history. A more accurate reading, in our view, reveals that the legislative impetus behind section 4454 was to accommodate all persons who object to medical care for religious reasons, not only Christian Scientists. See H.R. Conf. Rep. 105-217, at 768; 143 Cong. Rec. S8447 (daily ed. July 31, 1997) (statement of Sen. Hatch) . Congress was explicit that section 4454 was intended to provide "a sect-neutral accommodation available to any person . . . for whom the acceptance of medical health services would be inconsistent with his or her religious beliefs." H.R. Conf. Rep. 105-217, at 768 (emphasis added). Whether the religious objector is of the Christian Science faith or some other sect is immaterial; section 4454's benefits were intended for all persons who embrace spiritual healing over medical treatment.

The legislative history of section 4454 also distinguishes this case from Larson. There, the Supreme Court applied strict scrutiny to a statute governing reporting requirements for charitable organizations because it found that the statute was "drafted with the explicit intention of including particular religious denominations and excluding others." Larson, 456 U.S. at 254. The Court relied on the statute's legislative history to reach this conclusion, specifically noting that a provision found within an early draft of the law was struck because it would have brought a Roman Catholic Archdiocese within the law's scope, a result the legislature did not want. See id. In this case, there is no such evidence that Congress sought to include only Christian Scientists within the challenged provisions or, conversely, to exclude any other denomination.

Finally, the practical effect of section 4454 does not render it facially discriminatory. Appellants contend that section 4454 effectively discriminates among sects because the "criteria for a RNHCI were carefully gerrymandered to include only the Christian Science sanitoria, and to exclude as many other institutions as possible that could render the same care." However, even if appellants are correct that few facilities other than Christian Science sanitoria qualify as RNHCIs, this alone is insufficient to make section 4454 impermissibly discriminatory. See Larson, 456 U.S. at 246-47, n.23; Gillette v. United States, 401 U.S. 437, 452 (1971). In addition to disparate impact, a "claimant alleging 'gerrymander' must be able to show the absence of a neutral, secular basis for the lines government has drawn." Id.; see Church of the Lukumi Babalu Aye, 508 U.S. at 535. Because we believe that the detailed eligibility requirements set forth by Congress for RNHCI status reflect valid secular justifications, we conclude that section 4454 does not, in effect, constitute a religious gerrymander subject to strict scrutiny.

First, section 4454's limitation of RNHCI status to those institutions that provide only nonmedical services, see 42 U.S.C. § 1395x(ss)(1)(F), and that serve only patients who rely upon a religious method of healing, see 42 U.S.C. § 1395x(ss)(1)(C), seeks to prevent fraud and abuse of the Medicare and Medicaid programs. See H.R Conf. Rep. 105-217, at 769. By denying RNHCI status to institutions that do not exclusively treat persons that embrace spiritual healing, these eligibility criteria significantly limit the number of facilities that may be reimbursed for the provision of nonmedical care and that therefore must be monitored for compliance with section 4454. This limitation enables the government, in monitoring section 4454 compliance, to focus its time and resources on patients concentrated in a relatively small number of facilities, rather than on patients in thousands of health care institutions nationwide. As a result, the administration of section 4454 is both more manageable and effective, thereby decreasing the possibility that it will be used as a tool to defraud or abuse the Medicare and Medicaid programs.

Second, section 4454's exclusion from RNHCI status of those facilities that provide medical care, see 42 U.S.C. § 1395x(ss)(1)(C), that employ medical personnel, see 42 U.S.C. § 1395x(ss)(1)(D), and that are affiliated with medical care providers, see 42 U.S.C. § 1395x(ss)(1)(G), seeks to ensure the safety of patients receiving medical care through Medicare and Medicaid. See H.R Conf. Rep. 105-217, at 769. Without these requirements, an institution that provides both medical and spiritual healing services might qualify as an RNHCI and therefore evade the medical oversight and other quality of care standards that Medicare and Medicaid impose on all medical institutions, but not on RNHCIs. Such a result would compromise the safety of persons receiving medical care at institutions that also promote spiritual healing. Thus, these eligibility requirements ensure that only those facilities that provide no medical care are exempt from the medical oversight requirements; all others are subject to the full panoply of oversight mechanisms.

We are therefore satisfied that the detailed RNHCI eligibility requirements adopted by Congress reflect valid secular justifications. These eligibility requirements extend health care benefits to those individuals who are opposed to medical treatment and at the same time ensure patient safety and the overall vitality of the Medicare and Medicaid programs. In this sense, section 4454 resembles 26 U.S.C. § 1402(g), which exempts from social security taxes members of religious sects that have tenets opposed to the social security system. See 26 U.S.C. § 1402(g). Although section 1402(g) in practice applies almost exclusively to the Amish religious sect, courts have refused to apply strict scrutiny review to this provision because it has the valid secular purposes of "ensur[ing] the viability of the Social Security system and the coverage of all individuals in a public or private welfare plan." Droz v. Commissioner, 48 F.3d 1120, 1124 (9th Cir. 1995); see Jaggard v. Commissioner, 582 F.2d 1189, 1190 (8th Cir. 1978) (per curiam). The same is true of section 4454; it was intended to extend health care benefits to as many people as possible while at the same time ensuring the continued viability of the Medicare and Medicaid programs. Thus, we reject

appellants' contention that section 4454 constitutes gerrymandering in favor of Christian Scientists and therefore should be subject to strict scrutiny.[5]

In sum, we conclude that the district court properly refused to apply strict scrutiny review to section 4454 because it does not facially discriminate among religious sects.

**B.**

Having found that section 4454 is not subject to strict scrutiny review, we apply the three-part test set forth by the Supreme Court in Lemon. 403 U.S. at 612-13; see Hernandez, 490 U.S. at 695. Under the Lemon test, a law is permissible under the Establishment Clause only if: (1) it has a secular legislative purpose, (2) its primary effect is neither to advance nor to inhibit religion, and (3) it does not foster excessive government entanglement with religion.[6] See Lemon, 403 U.S. at 612-13.

---

[5]Appellants cite Grumet v. Pataki, 93 N.Y.2d 677 (N.Y. 1999), cert. denied, 120 S.Ct. 363 (1999), in support of their gerrymandering claim. The statute in that case, however, contained arbitrary wealth criteria that largely controverted any purported secular basis for the lines drawn by the statute, and the statute's legislative history evidenced an intent to extend a benefit to a single religious sect. See id. at 689-90, 694-95. In contrast, section 4454's criteria have valid secular bases, and its legislative history suggests an intent to benefits all persons who because of religious beliefs object to medical care.

[6]Although the Supreme Court in Agostini v. Felton suggested that the entanglement inquiry may be analyzed as part of the primary effect element, it also noted that "the general principles we use to evaluate whether government aid violates the Establishment Clause have not changed." 117 S.Ct. 1997, 2010 (1997). Accordingly, we have continued to treat the primary effect and entanglement elements as distinct inquiries, see Stark v. Independent School Dist., No. 640, 123 F.3d 1068, 1073, 1075 (8th Cir. 1997), and continue to do so here. See also Koenick v. Felton, 190 F.3d 259, 264-65 (4th Cir. 1999); Bridenbaugh v. O'Bannon, 185 F.3d 796, 798 (7th Cir. 1999).

-11-

**1.**

The requirement that the law reflect a valid secular purpose "aims at preventing the relevant governmental decisionmaker . . . from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." In re Young, 141 F.3d 854, 862 (8th Cir. 1998), cert. denied, 119 S.Ct. 43 (1998) (quoting Corp. of the Presiding Bishop v. Amos, 483 U.S. 327, 335 (1987)). This neutrality, however, "do[es] not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 705 (1994). Accordingly, the alleviation of a special, government-created burden on religious belief and practice constitutes a valid secular purpose under Lemon. See id.; Amos, 483 U.S. at 338.

Relying on these principles, the district court found that section 4454 possesses a secular legislative purpose because it removes a special burden imposed by the Medicare and Medicaid Acts upon persons who hold religious objections to medical care. We agree. The Supreme Court in Sherbert v. Verner held that legislation which forces an individual to choose between following his religious beliefs and receiving government benefits places a burden on that person's religious exercise. See 374 U.S. 398, 404 (1963). In Thomas v. Review Board of Indiana Employment Security Division, the Court reiterated this principle, stating that "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith . . . , thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." 450 U.S. 707, 717-18 (1981); see Frazee v. Illinois Dep't of Employment Sec., 489 U.S. 829, 832 (1989); Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 141 (1987).

Absent section 4454, the Medicare and Medicaid Acts place individuals who hold religious objections to medical care in a situation similar to that contemplated by

the Sherbert line of cases. They are forced to choose between adhering to their religious beliefs and foregoing all government health care benefits, or violating their religious convictions and receiving the medical care provided by Medicare and Medicaid. The pressure to violate religious convictions is especially acute under Medicaid, which often represents the only source of health care for indigent persons. By extending nonmedical health care benefits to individuals who object for reasons of religion to medical treatment, section 4454 spares such individuals from being forced to choose between adhering to the tenets of their faith and receiving government aid, and in doing so removes a burden that the law would otherwise impose.

Appellants contend that the Sherbert line of cases is inapposite to the present situation. They note that those cases involved accommodations that were required by the Free Exercise Clause (mandatory accommodations), whereas here the government does not contend that section 4454 is constitutionally required but only that it is permitted by the Establishment Clause (permissive accommodation). Appellants argue that within the context of a government benefit program only the alleviation of a burden so substantial that it implicates the Free Exercise Clause constitutes a secular purpose justifying accommodation. Because the government concedes that the burden relieved by section 4454 does not rise to this level, appellants conclude that section 4454 does not reflect a valid secular purpose.

We do not believe that the fact that Sherbert and its progeny involved mandatory accommodations renders them irrelevant to our analysis of section 4454's purpose. Indeed, those cases offer insight into what constitutes a burden on religious belief and whether the alleviation of that burden constitutes a valid legislative purpose under Lemon.

The Supreme Court has made clear that "[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." Walz v. Tax Comm'n, 397 U.S. 664, 673

-13-

(1970). Thus, it follows that some government-imposed burdens upon religion, although not severe enough to require accommodation under the Free Exercise Clause, may be sufficiently onerous to permit Congress to alleviate them without transgressing the Establishment Clause. To hold otherwise would be to limit Congress's power to accommodate religion to only those situations in which the accommodation is constitutionally required. Such a result would not only violate the Court's command in Walz, see id., it would also run counter to cases in which permissive accommodations have been upheld, see Amos, 483 U.S. at 336-39; Zorach v. Clausen, 343 U.S. 306, 315 (1952); Jaggard, 582 F.2d at 1190.

Accordingly, Sherbert and its progeny provide a starting point for determining when a government-imposed burden is sufficient to warrant a permissive accommodation. We conclude that, absent section 4454, the burden imposed by the Medicare and Medicaid Acts on persons who for religious reasons object to medical treatment justifies such an accommodation. In Sherbert, the plaintiff was forced to decide between adhering to her religious beliefs and receiving unemployment compensation benefits. See Sherbert, 374 U.S. at 401, 404. Without section 4454, the dilemma facing individuals who object to medical care is not significantly less foreboding, as they must choose whether to follow their faith or to accept government-funded health care. Although unemployment benefits may be broader in scope than health care benefits, both are widely available public benefits that are of great importance to personal well-being. Just as the burden in Sherbert was sufficient to require religious accommodation, we conclude that the burden imposed by the Medicare and Medicaid Acts, absent section 4454, is sufficient to permit congressional accommodation in a manner that does not run afoul of the Establishment Clause.

We therefore agree with the district court that, absent section 4454, the pressure imposed by the Medicare and Medicaid Acts upon certain individuals to accept medical care in violation of their religious beliefs constitutes a burden upon the exercise of those beliefs. See, e.g., Sherbert, 374 U.S. at 404. Because it attempts to alleviate this

-14-

burden by enabling such individuals to receive the nonmedical portion of Medicare- and Medicaid-funded care, section 4454 reflects a valid secular purpose.

## 2.

The second part of the <u>Lemon</u> test requires that the law's primary effect be neither to advance nor to inhibit religion. The parties contest the precise contours of this inquiry. Appellants contend that the tripartite "primary effect" framework articulated by the Supreme Court in <u>Agostini v. Felton</u> is applicable to all cases implicating the Establishment Clause, including those, like this, that involve religious accommodation. <u>See</u> 117 S.Ct. 1997, 2016 (1997).[7] The government argues that the proper analysis for assessing the primary effect of section 4454 is that which has been used by the Court in other cases involving legislative attempts to accommodate religion.

We agree with the position taken by the government. <u>Agostini</u> did not involve a religious accommodation, but instead concerned a generally applicable program of government assistance that incidentally benefitted parochial schools. <u>See</u> <u>Agostini</u>, 117 S.Ct. 2003-04. This distinction is significant because the second element of <u>Agostini's</u> primary effect analysis--that recipients of government aid may not be defined "by reference to religion"--is by its terms inconsistent with the Supreme Court's accommodation cases. The Court has on numerous occasions upheld laws of religious accommodation that have expressly defined beneficiaries by reference to religion. <u>See,</u> e.g., <u>Amos</u>, 483 U.S. at 329 n.1, 338 (exemption of religious organizations from Title VII); <u>Walz</u>, 397 U.S. at 666 n.1, 673 (state property tax exemption for religious

---

[7]In <u>Agostini</u>, the court used three criteria to evaluate whether a law granting government aid to schools had the effect of advancing religion: (1) whether it results in governmental indoctrination; (2) whether it defines its recipients by reference to religion; and (3) whether it creates an excessive entanglement with religion. <u>See</u> <u>Agostini</u>, 117 S.Ct. at 2016.

facilities); <u>Zorach</u>, 343 U.S. at 308 n.1, 315 (state program releasing public school children to religious institutions for religious instruction).  Therefore, while <u>Agostini's</u> tri-partite framework is relevant in analyzing the primary effect of generally applicable government programs that incidentally benefit religion, it does not lend itself to an examination of the effect of laws that are specifically designed to alleviate government-imposed burdens on religious practice and belief.

A more appropriate primary effect analysis, in our view, is that which the Court has applied to other legislative attempts to accommodate religion.  <u>See</u> <u>Texas Monthly, Inc. v. Bullock</u>, 489 U.S. 1, 11, 15-16 (1989) (plurality opinion); <u>Amos</u>, 483 U.S. at 337; <u>Estate of Thornton v. Caldor, Inc.</u>, 472 U.S. 703, 709-10 (1985); <u>see also</u> <u>Young</u>, 141 F.3d at 862.  Under this line of cases, legislation does not violate the second part of the <u>Lemon</u> test merely because it gives special consideration to a religious group or even because it better enables a religious institution to advance its cause.  <u>See</u> <u>Amos</u>, 483 U.S. at 337-38.  Instead, a religious accommodation impermissibly advances or inhibits religion only if it imposes a substantial burden on nonbeneficiaries, <u>see</u> <u>Texas Monthly</u>, 489 U.S. at 15, 18 n.8; <u>Estate of Thornton</u>, 472 U.S. at 709-10, or provides a benefit to religious believers without providing a corresponding benefit to a large number of nonreligious groups or individuals, <u>see</u> <u>Texas Monthly</u>, 489 U.S. at 11; <u>Amos</u>, 483 U.S. at 337; <u>Young</u>, 141 F.3d at 862.

The only potential burden that we can envision section 4454 imposing on nonbeneficiaries is an increased tax burden if, for example, the cost of care provided by an RNHCI is on average more costly than that provided by a medical institution, thereby increasing the total tax revenue needed to fund the Medicare and Medicaid programs.  This does not appear to be the case.  Even assuming as true appellants' assertion that RNHCI patients average longer institutional stays than medical patients, we believe that any increased cost caused by such stays is almost certainly offset by the lower costs of the services provided to RNHCI patients.  <u>See</u> Letter from Carolyne K. Davis, Health Care Finance Administrator, to Rep. Berkley Bedell of 11/23/83.

-16-

RNHCI patients receive none of the costly medical procedures, such as x-rays and laboratory tests, and only a small percentage of the physical care services received by persons obtaining care at medical institutions. See 42 U.S.C. § 1395x(ss)(1)(C); Hearing on H.R. 6675 Before the Senate Comm. on Finance, 89th Cong. 699 (1965) (statement of Dr. J. Buroughs Stokes).

Furthermore, even if section 4454 does impose some increased financial burden on nonbeneficiaries, any such burden is too minimal and diffuse to violate the second part of the Lemon test. See Estate of Thornton, 472 U.S. at 710 (striking down Sabbath observance law because it contained no exceptions designed to relieve the burden on employers and other employees). This is particularly true in light of the regulations implementing section 4454, which place detailed limits upon Medicare and Medicaid expenditures for RNHCI-provided services. See 42 C.F.R. §§ 403.750, 403.754, 403.756. We are satisfied, therefore, that section 4454 does not impermissibly burden nonbeneficiaries.

Next, we consider whether section 4454 confers a special benefit upon individuals who hold religious objections to medical care. See Texas Monthly, 489 U.S. at 11. Appellants contend that section 4454 bestows upon RNHCI patients benefits not available to the general public, making it possible for them to receive Medicare and Medicaid coverage for services that would not be covered if administered in a medical institution. The district court rejected appellants' argument and found that because section 4454 merely permits RNHCI patients to receive a "subset," i.e. the nonmedical portion, of the care provided by Medicare and Medicaid to patients of medical institutions, it extends no special benefit to religious believers who receive care at RNHCIs.

In support of their "special benefit" reading of section 4454, appellants focus upon "custodial care," a technically defined category of care that Medicare expressly excludes from its coverage. See 42 U.S.C. § 1395y(a)(9). Custodial care is any care

that is not ordered by a physician and that is not "so inherently complex" that it must be performed by, or under the supervision of, professional personnel. See 42 C.F.R. § 411.15(g); see also 42 U.S.C. §§ 409.31-.32. Custodial care thus includes the administration of ointments, routine care of incontinence, assistance in dressing and eating, and other similar services. See 42 C.F.R. § 409.33(d). Such services, however, are not considered custodial when given as part of an integrated plan of care that, as a whole, requires professional supervision. See 42 C.F.R. § 409.33(a)(1); Hurley v. Bowen, 857 F.2d 907, 912-13 (2nd Cir. 1988). Relying on this technical definition, appellants contend that all services provided by RNCHIs constitute custodial care because RNHCIs lack the medical personnel who, by definition, must participate in order for services to be deemed non-custodial, or "skilled." Appellants thus conclude that section 4454, by reimbursing RNHCI patients for the care that they receive, confers a benefit on such persons not available to individuals who receive care at medical institutions.

Appellants' narrow fixation on the definition of custodial care, however, overlooks the fact that RNHCI patients are not reimbursed for any services for which they would not be similarly reimbursed if they had sought care at a medical institution. Thus, section 4454 confers no special benefit upon persons who hold religious objections to medical care; it merely accommodates them.

Most critically, appellants ignore the fundamental principle upon which section 4454 is based and the practical effect that this principle has upon its operation. Section 1395i-5(a)(2) provides that Medicare and Medicaid payments may be made for "services furnished an individual in [an RNHCI] only if the individual has a condition such that the individual would qualify for benefits . . . if the individual were an inpatient or resident in a hospital or skilled nursing facility that was not [an RNHCI]." 42 U.S.C. § 1395i-5(a)(2) (emphasis added). Thus, an RNHCI patient whose illness is such that he would have received skilled care if he were at a medical institution may be reimbursed for the nonmedical services he receives at an RNHCI because, had he

-18-

attended a medical facility, he would have been reimbursed for such services as part of an aggregate plan of skilled care.  See 42 C.F.R. § 409.33(a)(1).  If, however, the patient's illness would not require services sufficiently complex to be deemed skilled care if he were at a medical facility, the patient would not be entitled to any Medicare benefits, just as a medical institution patient would not be so entitled.  Therefore, section 4454 extends to RNHCI patients only those benefits that they could have received if they had sought treatment at a medical institution, and then only a subset, i.e. the nonmedical portion, of those benefits.

Thus, while the fact that section 4454 does not require the involvement of medical personnel in RNHCI-provided care may render such care "custodial" under the regulations, it does not confer upon RNHCI patients any special benefit.  RNHCI patients, just like medical patients, may not be reimbursed for services that, if performed in a medical facility, would not constitute skilled care.  See 42 U.S.C. § 1395y(a)(9) (excluding custodial care from Medicare coverage for both medical institution and RNHCIs).  RNHCI patients are thus never reimbursed for services for which medical patients are not similarly reimbursed.  The only distinction is that the services provided by RNHCIs are not dispensed under professional medical supervision, a distinction that Congress found necessary to accomplish its purpose of accommodating individuals who have religious objections to medical care.

That section 4454 does not confer a special benefit upon RNHCI patients is perhaps best demonstrated by a more tangible illustration.  Suppose, for example, that two patients with similar health problems sought care at the facilities of their choice, with A attending a medical institution, and B an RNHCI.  While at their respective institutions, both A and B receive the same basic physical nursing services, such as changing of bed pans and assistance with eating and bathing.  A, however, receives these services along with medical services as part of an integrated plan of skilled care that requires professional supervision, while B receives only the nonmedical care services.  Under the Medicare Act, A would be reimbursed for both the medical and

the nonmedical services. Under section 4454, B, who had the very same condition as A, would also be reimbursed, although only for the limited, nonmedical care that he received.

On the other hand, if A's health problems are such that he needs only general assistance in eating and bathing, with no overriding health concerns requiring medical supervision, he would not be reimbursed by Medicare for any of the care that he received. Likewise, B, again suffering from the same affliction as A and receiving the same physical nursing services, would not be reimbursed for such services because, under 42 U.S.C. § 1395i-5(a)(2), B did not have "a condition such that [he] would qualify for benefits" if he were in a medical institution. Thus, section 4454 does not confer a special benefit upon individuals who are religiously opposed to medical treatment, but rather merely allows them to be reimbursed for a subset of those services for which they would be reimbursed if they had sought treatment at a medical institution. Although such services technically may be "custodial," in that medical professionals are not involved, the fact remains that the benefits received by such individuals are not in any way special, or above and beyond those which medical patients receive.[8]

Section 4454 does not in any other way impermissibly benefit the religious cause of individuals who object to medical care. Section 4454 does not create any more of an incentive for persons to engage in religion than other religious accommodations that have been upheld by the Supreme Court. See Amos, 483 U.S. at 329-30 (exemption

[8]Appellants also argue that RNHCI patients receive a special benefit because coverage decisions regarding RNHCI patients are made by laypersons and without medical examination, thereby making it possible for RNHCI patients to be reimbursed for services that, under medical diagnosis, might have been found to be outside of the scope of Medicare and Medicaid coverage. Because we find that RNHCI coverage decisions are subject to substantial and meaningful review by the Secretary, or her agent, see Part II.A.3., we find this argument unpersuasive.

of religious institutions from Title VII's non-discrimination provisions); Walz, 397 U.S. at 666-67 (exemption of religious organizations from state property tax). Nor does section 4454 benefit religion by providing direct funding for religious activity. Section 4454 authorizes payment only for "inpatient hospital services or post-hospital extended care services," 42 U.S.C. §§ 1395i-5(a), which are defined as bed and board and such other physical care services that are ordinarily furnished by health care facilities, see 42 U.S.C. §§ 1395x(b); 1395x(h). Thus, Medicare and Medicaid do not fund the spiritual healing services that may take place within RNHCIs. See Medicare and Medicaid Programs, 64 Fed. Reg. 67,028, 67,044 (1999) ("Neither Medicare nor Medicaid will pay for any religious aspects of care provided in [RNHCIs].").

Finally, section 4454 does not cause government aid to flow to "pervasively sectarian institutions," the funding of which constitutes an improper benefit to religion. See Bowen v. Kendrick, 487 U.S. 589, 609-610 (1988). A pervasively sectarian institution is one in which religion so pervades its functions that any government aid it receives, even if designated for secular activities, impermissibly assists religion because the institution is unable to separate the funded secular activities from its religious mission. See id.; Roemer v. Bd. of Pub. Works, 426 U.S. 736, 753-54 (1976). Conversely, an institution is not pervasively sectarian if its primary function is secular and if this function can be effectively separated from its religious activity. See id. at 755. As so defined, we cannot say that RNHCIs are pervasively sectarian.

The primary function of RNHCIs, by definition, is to provide "nonmedical items and services to inpatients on a 24-hour basis" through "nursing personnel who are experienced in caring for the physical needs of [RNHCI] patients." See 42 U.S.C. §§ 1395x(ss)(D), (E). Because these physical care services, such as dressing of wounds and assistance in eating, are inherently secular, see Lemon, 403 U.S. at 616-17, and "are not converted into [religious activities] by the fact that they are carried out by organizations with religious affiliations," Bowen, 487 U.S. at 613, the primary function of RNHCIs is secular in nature. Furthermore, nothing in section 4454 suggests that

-21-

these physical care services cannot be separated from the prayer and other religious activities that may occur within RNHCIs. Accordingly, because RNHCIs are not pervasively sectarian institutions, their receipt of government funding does not impermissibly benefit religion.

In sum, section 4454 does not in any way confer a special benefit upon religion.

**3.**

The third part of the <u>Lemon</u> test requires that the law not foster excessive government entanglement with religion. Appellants contend that section 4454 violates this part because it effectively delegates Medicare and Medicaid coverage decisions to RNHCIs in violation of <u>Larkin v. Grendel's Den, Inc.</u>, in which the Supreme Court struck down a law granting churches discretionary authority over the issuance of liquor licenses. <u>See</u> 459 U.S. 116, 126-27 (1982). Appellants argue that section 4454 effects a similar delegation because it permits RNHCI utilization review committees, which are composed of lay persons who are religiously opposed to medical care, to make admissions and other coverage decisions that are not based on medical examination or diagnosis and that, according to appellants, are largely insulated from governmental review. Whatever merit this argument might have if RNHCIs in fact held ultimate decision-making authority regarding Medicare and Medicaid coverage, we do not believe that section 4454 grants RNHCIs such authority, either on its face or in effect.

Section 4454, by its terms, makes clear that an RNHCI offers only an initial recommendation regarding Medicare and Medicaid coverage. <u>See</u> 42 U.S.C. §§ 1395x(ss)(1)(H)-(J), 1395x(ss)(3)(B)(ii). This recommendation must contain information regarding the RNHCI's coverage determination and any other information that the Secretary may deem necessary to effectively review the RNHCI's decision. <u>See</u> 42 U.S.C. §§ 1395x(ss)(1)(I)-(J). The Secretary, typically acting through a fiscal intermediary in the form of a private insurance company, then reviews the RNHCI's

recommendation to finally determine whether the patient is entitled to Medicare or Medicaid benefits for the services provided by the RNHCI. See 42 U.S.C. §§ 1395x(ss)(1)(H)-(J), 1395x(ss)(3)(B)(ii). Thus, section 4454 expressly provides for governmental review of RNHCI coverage decisions and establishes a procedure to achieve this end.

Furthermore, the governmental review required by section 4454 is, in our view, substantial. First, we are confident that the Secretary has access to sufficient information to conduct a meaningful review of an RNHCI's coverage recommendation. Although the Secretary cannot require RNHCI patients to undergo a medical examination to assist her in her review, see 42 U.S.C. § 1395x(ss)(3)(A)(i), she is authorized to obtain any other information that she believes to be necessary to perform her evaluation, see 42 U.S.C. § 1395x(ss)(3)(A)(ii). Indeed, the Secretary is expressly empowered to deny Medicare and Medicaid benefits to an RNHCI patient if any information requested is not provided. See id. Second, we see no reason to question the soundness of Congress's judgment that the Secretary generally will be able to make a competent coverage determination based upon the nonmedical information available to her. That the Secretary's evaluation may be made more difficult by the lack of medical data does not render her review illusory.

Section 4454 requires RNHCIs to make reasoned coverage recommendations that are subject to meaningful governmental review. This stands in stark contrast to the decision-making authority present in Larkin, where the church possessed authority that "call[ed] for no reasons, findings, or reasoned conclusions," and which was subject to no review whatsoever. Larkin, 459 U.S. at 125, 127. We thus conclude that section 4454 does not impermissibly delegate authority to RNCHIs in violation of the third part of the Lemon test.

In sum, we agree with the district court that section 4454 constitutes a permissible accommodation of religion.

### III. As-Applied Challenge to Section 4454

Appellants also argue that, even if not unconstitutional on its face, section 4454 violates the Establishment Clause as applied to Christian Science sanitoria. Appellants contend that section 4454 benefits the Christian Science sect in violation of the second part of the Lemon test because it authorizes direct funding of Christian Science sanitoria, institutions that appellants claim to be pervasively sectarian in nature. An institution is not pervasively sectarian, however, if its primary function is secular and if this function can be effectively separated from the institution's religious activity. See Roemer, 426 U.S. at 755. Because we find that Christian Science sanitoria possess both of these qualities, we conclude that Christian Science sanitoria, like all RNHCIs, are not pervasively sectarian.

First, the primary function of Christian Science sanitoria is secular in nature. Christian Science sanitoria predominantly provide physical nursing services to sick individuals. See Ruth Anne Cook Aff. ¶ 16 (Christian Science nurses bathe patients, wash and bandage sores, change bed pans, and assist patients in dressing and walking). Although Christian Science nurses administer these services with the hope that they will assist the spiritual healing process, a religious motivation on behalf of a party providing secular services does not transform such services into religious activity. See Bowen, 487 U.S. at 613, 621. Thus, the primary function of Christian Science sanitoria--the provision of physical nursing services--is secular.

Second, the physical services provided by Christian Science sanitoria are distinct and separable from any religious activity that may take place within such facilities. Just as the provision of health services in religious schools does not have the primary effect of aiding religion, see Wolman v. Walter, 433 U.S. 229, 242 (1977), no more so does the administering of mundane physical services in Christian Science sanitoria. Accordingly, we reject appellants' as-applied challenge to section 4454.

## Conclusion

For all of the reasons set forth above, we affirm the judgment of the district court.

LAY, Circuit Judge, dissenting.

I respectfully dissent.

The basic deficiency of the majority opinion is that it upholds the constitutionality of a statute which provides a government benefit solely to religious institutions and their adherents. I am aware of no other decision in the Untied States which has upheld such a program. As the Supreme Court observed in Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 710 (1985):

> This unyielding weighting in favor of [a particular faith] over all other interests contravenes a fundamental principle of the Religion Clauses, so well articulated by Judge Learned Hand:
>
> "The First Amendment . . . gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities."

(citation omitted).

The fundamental principle underlying the First Amendment's Establishment Clause is government neutrality toward religion. See Everson v. Board of Educ., 330 U.S. 1, 15 (1947) (government should not "pass laws which aid one religion, aid all religions, or prefer one religion over another."). While the Medicare and Medicaid provisions at issue are veiled in textual neutrality, it is well-settled that facial neutrality of a law is not dispositive; rather, a court must examine a law's form and effect. See Church of the Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520 (1993) (striking

down ordinances which targeted the religious activity of animal sacrifice practiced by the Santeria religion). When the form and effect of the Medicare and Medicaid provisions are examined, it becomes clear that they are an abandonment of the fundamental principle of neutrality and merely serve to replicate the unconstitutional provisions struck down in Children's Healthcare is a Legal Duty, Inc. v. Vladeck, 938 F.Supp. 1466 (D. Minn. 1996) (CHILD I).

In the face of an Establishment Clause challenge there are two possible tests: 1) the three-prong test announced in Lemon v. Kurtzman, 403 U.S. 602 (1971)[9]; and

[9]A number of Supreme Court Justices have expressed doubts about the continued utility of Lemon. See Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 398 (1993) (Scalia, J., concurring) (noting that "no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature's heart . . . and a sixth has joined an opinion doing so.") Despite this, in 1997, the Supreme Court invoked Lemon to overrule a prior decision which held that the Establishment Clause barred the city from sending public school teachers into parochial schools to provide remedial education. See Agostini v. Felton, 521 U.S. 203 (1997). Agostini served both to reaffirm the general principles of Lemon and to slightly alter its landscape by merging two of its prongs. Post-Agostini, an Establishment Clause challenge follows these steps: 1) the government must act with secular purpose; and 2) the government action must not have as its primary effect the advancing or inhibiting of religion. The analysis of prong two is then further broken down into three steps: a) whether aid results in government indoctrination; b) whether aid recipients are defined by reference to religion; and c) whether excessive entanglement between government and religion is created.

The majority concludes that Agostini's revision of Lemon is inapplicable to accommodation cases. Because the majority follows the traditional Lemon analysis, this dissent will rebut that analysis. Nonetheless, while Agostini is factually distinguishable from the instant case, it remains the Court's most recent pronouncement on the proper application of Lemon, and its terms ought not be so easily displaced. Regardless, whether one applies the traditional Lemon analysis or its revision under Agostini, the provisions in this case fail.

2) the stricter standard of review articulated in <u>Larson v. Valente</u>, 456 U.S. 228 (1982), for laws which facially discriminate among religions. The Medicare and Medicaid provisions at issue exhibit denominational preference such that strict scrutiny is required; regardless, even if one accepts the majority's position that <u>Larson</u> is inapplicable, the statutes are unconstitutional under <u>Lemon</u>.

## I.    STRICT SCRUTINY

In <u>Larson</u>, the Court stated that "when we are presented with a . . . law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality." 456 U.S. at 246. Under <u>Larson</u>, a law that makes explicit and deliberate distinctions between religious organizations must be closely fit to the furtherance of a compelling government interest. See <u>id.</u> at 246-47. Critically, the law at issue in <u>Larson</u> did not name any particular religious group. The Court looked beyond this, however, and examined the law's intent and legislative history and found it demonstrated a denominational preference for older, more established churches. See <u>id.</u> at 255. Thus, a law can "facially discriminate" among religions even when it does not expressly distinguish by sect name. To determine whether strict scrutiny applies, a court looks at a law's text, legislative history, and real operation. See <u>Church of the Lukumi Babalu Aye</u>, 508 U.S. at 533-35.

The majority errs in holding that the provisions here do not reveal facial differentiation of religious sects. Admittedly, the Medicare and Medicaid provisions do not specifically name any religious sect; however, every other indicator reveals that these provisions are far from neutral and that they have as their object a denominational preference for Christian Scientists.

## A. Legislative History of Section 4454

From their very inception, the Medicare and Medicaid provisions have reflected explicit and deliberate distinctions among religions. On August 7, 1996, the United States District Court for the District of Minnesota held unconstitutional those portions of the Medicare and Medicaid statutes and regulations which specifically directed benefits to "Christian Science sanatoria." See CHILD I, 938 F.Supp. 1466. In direct response to this, Senator Orrin Hatch proposed an amendment to the law entitled "Christian Science Sanitoria." (App. at 108.) This amendment stated that, as a result of CHILD I, "unless [Medicare/Medicaid] is changed, large numbers of Christian Scientists who have paid into Medicare for over 30 years will be denied access to the benefits they reasonably expected for care provided in Christian Science nursing care facilities." (Id.) Thus, it is clear that the sole impetus for the present law was the alleged plight of Christian Scientists.

The Senate Finance Committee approved Senator Hatch's amendment, and the proposal was eventually embodied in section 4454 of the Balanced Budget Act of 1997 (section 4454). Section 4454 substituted the words "religious nonmedical health care institution" (RNHCI) for each reference to "Christian Science sanatorium" which had been struck by CHILD I. During the debate on the Balanced Budget Act of 1997, Senator Kennedy spoke in favor of section 4454, stating:

> When Medicaid and Medicare were enacted over 30 years ago, Congress included a special provision granting a religious accommodation for members of the church . . . .

> For 30 years, the Christian Science Church relied on Medicare and Medicaid benefits and built a health care system that assists thousands of men and women.

> . . . .

This [amendment] meets the worthwhile goals of the original Medicare and Medicaid laws, while meeting constitutional concerns. It deserves to be enacted into law so that the needed benefits will *continue* to be available.

143 Cong. Rec. S6301-02, S6321-22 (daily ed. June 25, 1997) (emphasis added).

On July 31, 1997, Senator Hatch, discussing section 4454, expressed concern over the recent decision in CHILD I, and stated:

Mr. President, I would like to turn now to another provision, the need for which was brought to my attention by Ms. Michelle Newport, a Christian Scientist in Salt Lake City, UT.

Under several provisions of Medicare and Medicaid law, reimbursement has been authorized for literally decades for nonmedical hospital and skilled nursing facility services provided in sanitoria operated by the First Church of Christ, Scientist.

143 Cong. Rec. S8415-01, S8447 (daily ed. July 31, 1997).

Additionally, the House Conference Report on section 4454 reveals Congress' interest in "continuing" benefits to Christian Scientists. The Report provides:

The conference agreement *continues* the provision of needed nonmedical nursing services to poor and elderly Americans who have contributed to the Medicare and Medicaid systems, without requiring them to violate their sincerely held religious beliefs. . . . The conference agreement replaces [the provisions struck down in Child I] with a sect-neutral accommodation available to any person who is relying on a religious method of healing and for whom the acceptance of medical health services would be inconsistent with his or her religious beliefs. . . .

. . . .

-29-

[The agreement] avoids the unfairness of requiring these Americans to pay taxes . . . for years without being able to receive any benefits. The Conferees believe it would be particularly harsh to cut off nursing benefits for poor and elderly men and women who have not made alternative arrangements for financing their health care and who now rely on the availability of nonmedical nursing benefits at a time when other patients receive reimbursement for hospital care.

H.R. Conf. Rep. 105-217 (emphasis added).

Admittedly, the legislative history of section 4454 includes some language implying an intent to accommodate a broad class of religious objectors. The majority relies on this apparent breadth and finds the legislative history demonstrates an intent to benefit all persons "who embrace spiritual healing over medical treatment" and reveals no evidence of an intent to include only Christian Scientists. Such conclusion ignores the clear theme underlying every aspect of the legislative history -- Congress sought to "continue" the benefits that previously existed. Those prior benefits were specifically and solely directed to Christian Scientists. In essence, Congress designed section 4454 to fit precisely into the gap left by CHILD I. In 1997, Congress' approach to providing these benefits was certainly more sophisticated than the original provisions; however, "[t]he Constitution 'nullifies sophisticated as well as simple-minded modes' of infringing on Constitutional protections." U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 829 (1995) (quoting Lane v. Wilson, 307 U.S. 268, 275 (1939)).

The legislative history in this case reveals a specific intent to solely benefit Christian Scientists. Congress' incredibly narrow crafting of the new provisions leaves no doubt regarding their lack of neutrality and denominational preference for Christian Scientists.

-30-

## B.    The Actual Effect of Section 4454

As the Supreme Court has observed, further evidence of a law's object can be found by analyzing its actual effect.  See id. at 535 ("[a]part from the text, the effect of a law in its real operation is strong evidence of its object.")  In practice, the statutes at issue encompass only Christian Science sanatoria.    Under 42 U.S.C. § 1395x(ss)(1)(C), RNHCI benefits must be received in an institution that provides "only nonmedical nursing items and services exclusively to patients who choose to rely solely upon a religious method of healing and for whom the acceptance of medical health services would be inconsistent with their religious beliefs."  Further, 42 U.S.C. §§ 1395x(ss)(1)(D) and (G) exclude from the definition of RNHCI institutions that employ medical personnel or that affiliate with medical organizations.  Despite the breadth of this language, no party has been able to point to any group beyond Christian Science sanatoria that presently qualify under the RNHCI provisions.  Thus, the real operation of section 4454 continues to select only Christian Science sanatoria for a special benefit.

The actual effect of section 4454 closely parallels that of Chapter 390 in Grumet v. Pataki, 720 N.E.2d 66 (N.Y), cert. denied, 120 S.Ct. 363 (Oct. 12, 1999) (Kiryas Joel III).  In Kiryas Joel III, the New York Legislature attempted, for the third time, to establish a public school district for the benefit of disabled children in the Village of Kiryas Joel.  Village residents strictly adhere to Satmar Hasidism.  The latest incarnation of the school district law used wholly secular language; the court, however, found "[a]lthough chapter 390 sets forth facially neutral criteria, any attempt to characterize the statute as a religion-neutral law of general applicability is belied by its actual effect."  Id. at 72.  The actual effect of Chapter 390 allowed the Village of Kiryas Joel and only one other municipality to benefit.  The court found that Chapter 390 was crafted "in such a way that permits the statute's benefits to flow almost exclusively to the religious sect it was plainly designed to aid."  Id. at 73. The same must be said of section 4454.

The majority does not contest the idea that only Christian Science sanatoria qualify as RNHCIs. The majority argues, however, that "a claimant alleging 'gerrymander' must be able to show the absence of a neutral, secular basis for the lines government has drawn." Gillette v. United States, 401 U.S. 437, 452 (1971) (finding exemption from draft for conscientious objectors had valid, neutral reasons for limitation to objectors of "war in any form"). The majority then identifies the criteria for RNHCIs and articulates possible secular purposes for each criterion. While each aspect of the new law may appear to be neutral when taken independently, as a whole it is clear that section 4454 only identifies Christian Science sanatoria. The neutrality of the words in isolation cannot camouflage the lack of neutrality of the whole. It is apparent that the definition and qualifying criteria, though not entirely devoid of secular bases, are drawn to benefit a single sect.

Additionally, appellees argue that the fact that no one else presently qualifies is not evidence of section 4454's lack of neutrality. I disagree. That only one religious organization can currently be identified accentuates the suggestion that the criteria were carefully and tightly drawn with an intent to solely benefit Christian Scientists.

Thus, section 4454's legislative history and its actual effect point to its underlying denominational preference. In light of this, this court should have analyzed the statutes under Larson's rule of strict scrutiny. In so doing, the law, on its face, demonstrates there exists no compelling interest in providing special benefits to adherents of a particular religious sect. Thus, I would hold section 4454 to be unconstitutional.

## II.    LEMON ANALYSIS

Assuming, arguendo, that Larson does not apply, section 4454 still fails under Lemon. In Lemon, the Court established a three-prong analysis: a law must 1) have

a secular purpose; 2) have a primary effect that neither advances nor inhibits religion; and 3) avoid excessive government entanglement with religion. 403 U.S. at 612-13.

## A.    Secular Purpose

To satisfy the first prong of <u>Lemon</u>, a statute must have a secular purpose.  As was noted above, the legislative history of section 4454 reveals a purpose to "continue" the benefits previously provided to Christian Scientists, or, if one accepts the majority's interpretation, the legislative history reveals an intent to benefit all religious objectors to medical care.  In either case, such purpose is not secular.  The Supreme Court has recognized, however, that accommodation of religion, i.e. the alleviation of significant governmental interference with the exercise of religion, can constitute a permissive secular purpose.  <u>See</u> <u>Corp. of the Presiding Bishop v. Amos</u>, 483 U.S. 327, 335 (1987) (upholding application of religious exemption to Title VII's prohibition of religious discrimination in employment).  Critically, however, while there can be constitutionally permissive accommodations beyond what is required by the Constitution, "accommodation is not a principle without limits."  <u>Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet</u>, 512 U.S. 687, 706 (1994) (<u>Kiryas Joel I</u>) (concluding that singling out the Kiryas Joel community for special treatment violated the principle of neutrality to which all accommodations must adhere).  As Judge Murphy eloquently noted: "[a]n asserted motivation of religious accommodation . . . cannot shield governmental actions that otherwise violate the principle of neutrality embedded in the establishment clause."  <u>Stark v. Independent Sch. Dist., No. 640</u>, 123 F.3d 1068, 1079 (8th Cir. 1997) (Murphy, J. dissenting), <u>cert.</u> <u>denied</u>, 523 U.S. 1094 (1998).  Despite Judge Murphy's wise counsel, today's majority seems to allow the rallying-cry of "accommodation" to rule the day.

The majority holds that section 4454 properly accommodates religion.  As the starting point for its accommodation analysis, the majority relies on <u>Sherbert v. Verner</u>, 374 U.S. 398, 399 n.1  (1963) (reversing denial of benefits to Sabbatarian who refused

to work on Saturday after noting there is no "doubt that the prohibition against Saturday labor is a basic tenet of the Seventh-day Adventist creed, based upon that religion's interpretation of the Holy Bible"), and Thomas v. Review Bd. of the Indiana Employment Sec. Div., 450 U.S. 707, 716 (1981) (reversing denial of unemployment benefits to Jehovah's Witness who refused to make military equipment, noting that "petitioner terminated his work because of an honest conviction that such work was forbidden by his religion."). The majority states section 4454 removes "a special burden imposed by the Medicare and Medicaid Acts upon persons who hold religious objections to medical care." The majority contends that without section 4454, individuals who object to medical care are burdened because they are forced to choose between adhering to their religious beliefs and foregoing health care, or violating their beliefs and receiving care. The majority then concludes this "burden" is comparable to that of Sherbert and Thomas and justifies an accommodation.

The majority's analysis is flawed in two ways. First, any "burden" present in this case is not of the kind that accommodation theory was designed to remedy. Second, even if a proper burden existed, the "accommodation" provided goes beyond what is constitutionally permissible and is instead an establishment of religion.

In Gillette, the Court upheld that section of the Military Selective Service Act exempting people conscientiously opposed to participation in war in any form. The Court stated that "'[n]eutrality' in matters of religion is not inconsistent with 'benevolence' by way of exemptions from onerous duties . . . ." 401 U.S. at 454 (internal citations omitted) (emphasis added). In Amos, in the face of an Establishment Clause challenge, the Court upheld Section 702 of the Civil Rights Act of 1964, which allowed certain religious employers to discriminate on the basis of religion. The Court found this exemption had the purpose and effect of "alleviating significant governmental interference" with the exercise of religion. 483 U.S. at 339 (emphasis added). These two cases present religious accommodation as a method of removing significant governmental burdens on the free exercise of religion. In contrast, the facts

-34-

of the present case reveal that the statutory provisions at issue benefit, as opposed to, burden certain religious adherents.

The majority's conclusion that a "burden" exists is based on a basic misunderstanding of Medicare and Medicaid. These programs form a framework through which government provides the secular benefit of medical care. The statutory scheme allows reimbursement for expenses for reasonable in-patient hospital expenses, post-hospital care services, and post-hospital home care expenses. Critically, Medicare and Medicaid do not cover all health care services, but only those that are "reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." 42 U.S.C. § 1395y(a)(1)(A). Thus, reimbursement of personal nursing care is only allowed when it is an integral component of medical care. Without section 4454, religious objectors to medical care are denied reimbursement for nonmedical personal nursing care because they decline to accept the very benefit (medical care) for which any reimbursement of such care must be a part. This choice to decline a benefit is not a "burden." As is stated in the opening of this dissent, no other decision has ever upheld government benefits solely because of religious belief. The majority fails to recognize the fundamental and significant difference between the affirmative award of government benefits to religious adherents and a government exemption designed to alleviate a burden.

The logic employed by the majority would allow nearly anything to be deemed a burden so as to permit an accommodation. For example, states fund public education. Religious individuals choose not to accept such education for religious reasons. The states' funding of public education includes funds for textbooks which are integral to the process of public education. Under the majority's reasoning, a religious group with an independent education system could assert that the states' failure to pay for their tuition and textbooks is a burden such that a legislative accommodation would be permissible. Such logic is both strained and unconstitutional.

Even if a proper burden existed, section 4454 far exceeds a constitutionally permissible accommodation. While the Supreme Court has not specifically defined the test for evaluating accommodations, at minimum, an accommodation cannot benefit only particular religions or benefit all religions but not nonreligious organizations. In Estate of Thornton v. Caldor, the Court struck down a Connecticut statute which provided Sabbatarian employees with an absolute right not to work on their Sabbath without losing the right to their unemployment benefits. The Court found the law impermissibly gave Sabbatarians privileges that were not available to others who had legitimate but non-religious reasons for missing weekend work. See Caldor, 472 U.S. at 710 n.9. In Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989), Texas exempted religious periodicals from its sales tax. The Court observed that while it had previously upheld statutes which directed governmental benefits to religions, in those cases "the benefits derived by religious organizations flowed to a large number of nonreligious groups as well." Id. at 11. The Court cautioned that it "would not have hesitated to strike them down for lacking a secular purpose and effect" if only certain religious organizations had benefitted. Id. The benefit at stake in section 4454 flows only to Christian Science sanatoria. As such, even if a burden existed, section 4454 violates the Court's proscription against benefitting only certain religious organizations and, thus, cannot be a proper accommodation.

## B.    Primary Effect

Under Lemon, a statute cannot have as its primary effect the advancement or inhibition of religion. This effects prong has been interpreted to mean that government action cannot have the effect of endorsing religion. In County of Allegheny v. ACLU, 492 U.S. 573, 592 (1989), the Court noted, "[i]n recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence." In Texas Monthly, focusing on the breadth of the benefitted class, the plurality stated:

when government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion . . . it "provide[s] unjustifiable awards of assistance to religious organizations" and cannot but "conve[y] a message of endorsement" to slighted members of the community.

Texas Monthly, 489 U.S. at 14 (quoting Amos, 483 U.S. at 348 (O'Connor, J. concurring)). Thus, statutes are an unconstitutional endorsement of religion when they provide a benefit to one community that is not equally provided to others. See Kiryas Joel I, 512 U.S. at 703-04. Section 4454 does just this.

Medicare expressly excludes reimbursement for "custodial care." 42 U.S.C. § 1395y(a)(9). Custodial care is defined as "any care that does not meet the requirements for coverage as [skilled nursing] care . . . ." 42 C.F.R. 411.15(g). "Skilled nursing" care is defined as services that are ordered by a physician, require the skills of technical or professional personnel, and are furnished by or under the supervision of such personnel or physician. See 42 C.F.R. 409.31. Further, the regulations of "skilled nursing facilities" provide that, to be considered a skilled service, it "must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a). Personal care services, such as administration of routine oral medication, eye drops, ointments, changing dressings, and routine care of incontinent patients, are generally not skilled services and are excluded from reimbursement under the "custodial care" exception. See 42 C.F.R. § 409.33(d).

An RNHCI is defined in 42 U.S.C. § 1395x(ss)(1) as an institution that provides only nonmedical nursing items and services exclusively to religious medical objectors practicing religious healing and uses only nonmedical personnel. Further, an RNHCI, by definition, has institutional religious beliefs against providing medical care,

examination, diagnosis, prognosis, or treatment, and can have no affiliation with medical providers. See id.

Under the very definition provided, it is readily apparent that the services provided in an RNHCI cannot meet the requirements for skilled nursing services and are instead custodial services. Consequently, such care should be excluded from reimbursement. By giving benefits to certain religious groups which are unavailable to others, section 4454 unconstitutionally places the imprimatur of government on the Christian Science faith.[10]

The majority does not dispute that the care provided in RNHCIs fits within the definition of "custodial care." Rather, the majority tries to distinguish RNHCI care from mere custodial care by noting that 42 U.S.C. § 1395i-5(a)(2) provides that payments are made for services furnished to an individual in an RNHCI only if "the individual has a condition such that the individual would qualify for benefits . . . if the individual were an inpatient or resident in a hospital or skilled nursing facility that was not an [RNHCI]." The majority asserts that this provision ensures that an RNHCI

_____

[10]The record in this case reveals that not only is improper custodial care being provided and reimbursed at RNHCIs, but the services provided are themselves sectarian in nature. In general, Christian Science nurses care for bodily needs, bandage wounds, and help patients move about the sanatorium, while Christian Science practitioners administer prayer-healing. There is significant evidence in the record, however, that the nurses, who are present on site and paid by RNHCIs, are practicing faith healing in the sense of giving support to practitioners. For example, there is evidence in the form of affidavits from nurses discussing their religious training and indicating they provide services such as Bible reading and prayer. See e.g. Affidavit of Ruth Anne Cook (App. at 178-187). Appellees are quick to point out that the practitioners are the ones who truly promote Christian Science faith healing and that they are not paid by the Medicare benefits. The facts reveal, however, that sectarian services are being provided by nurses. Thus, the statutory scheme allows Medicare payments to support the practice and furtherance of faith healing.

patient will only be reimbursed if his or her illness is such that he would have received skilled care in a medical institution and thus, such patient is not receiving anything "special" but is instead receiving merely a "subset" of benefits.[11]

The majority's reasoning defies sensibility. To assert that RNHCI benefits are a "subset" of medical benefits is a categorical error. The entire nature of Medicare and Medicaid is to provide medical services in a manner managed by medical criteria and qualifications and governed by the medical profession. RNHCIs and the care they provide are, by definition, "nonmedical." That which is defined as <u>not</u> being X cannot logically be a subset of X. Admittedly, certain "nonmedical" care is necessary for the furtherance of medical care; however, reimbursement for such nonmedical care was never intended to be a stand-alone benefit. Nonmedical aspects of care, such as room and board, are covered only as incidents of medical care. Allowing RNHCI's to receive reimbursement for nonmedical services as a stand-alone benefit has the effect of endorsing religion.

The majority provides a hypothetical in the hopes of elucidating its argument; but the comparison provided is malapropos. The majority compares two patients, one in an RNHCI and one in a medical facility, and argues that they will always receive the same care with the patient in the medical facility merely receiving <u>more</u> care. The difficulty with this comparison is that it compares medical care to nonmedical care. A more apt comparison is between those groups receiving stand-alone nonmedical services. RNHCI patients receive stand-alone nonmedical services and <u>are</u> reimbursed for them because of their specific religious beliefs; non-religious objectors and custodial care patients receive stand-alone nonmedical services and <u>are not</u> reimbursed for them because of their lack of specific religious beliefs. This comparison reveals

_____

[11]The majority's reliance on this provision is misplaced. This provision is intricately related to the unconstitutional delegation of authority at play in this case, an issue more thoroughly discussed in Section C below.

that the receipt of stand-alone nonmedical benefits is a special benefit to a single religious group.  As such, it violates the effects prong of Lemon.

###     C.     Excessive Entanglement

The third prong of the Lemon analysis requires that a law not foster excessive entanglement of government and religion.  In Larkin v. Grendel's Den, Inc., 459 U.S. 116 (1982), the Court struck down a Massachusetts statute granting religious bodies veto power over applications for liquor licenses.  The Court held that the statute violated the neutrality principle in two ways: 1) by fusing governmental and religious functions through the delegation of important discretionary governmental powers to religious bodies; and 2) by lacking any effective guarantee that the delegated power would be used for secular, neutral purposes.  See id. at 125-26.  In Kiryas Joel I, the Court stated that the statute creating the Kiryas Joel school "depart[ed] from [the] constitutional command [of the Establishment Clause] by delegating the State's discretionary authority over public schools to a group defined by its character as a religious community, in a legal and historical context that gives no assurance that governmental power has been or will be exercised neutrally."  Kiryas Joel I, 512 U.S. at 696.  In essence, the prohibition on excessive entanglement minimally means "a State may not delegate its civic authority to a group chosen according to a religious criterion."  Id. at 696-97.  See also Barghout v. Bureau of Kosher Meat and Food Control, 66 F.3d 1337, 1342 (4th Cir. 1995) (striking an ordinance that made it a misdemeanor to offer for sale, food falsely labeled as kosher because the statute fostered excessive entanglement "by vesting significant investigative, interpretive, and enforcement power in a group of individuals based on their membership in a specific religious sect.").

The statutory scheme at issue in this case violates this principle.  The provisions allow the initial decision regarding medical necessity to be made at the RNHCI and initially reviewed by the RNHCI's utilization review committee.  Admittedly, the

-40-

statutes purportedly vest final decision-making authority in the Secretary of Health and Human Services (Secretary). The majority relies on this "ultimate decision-making authority" to overcome any entanglement difficulties. There are, however, two pitfalls to the review provisions.

First, the initial decisions are made by individuals wholly opposed to medical care. In his dissent in Bowen v. Kendrick, 487 U.S. 589, 636 (1988), Justice Blackmun noted that, "asking religious organizations to teach and counsel youngsters on matters of deep religious significance, yet expect[ing] them to refrain from making reference to religion is both foolhardy and unconstitutional." It is no less foolhardy to ask an individual opposed to medical care on a religious basis to make a medical determination without regard to religion. This case, however, presents an even more outrageous hypothesis. The Christian Science faith not only opposes medical care; it altogether denies the reality of pain and disease. See MARY BAKER EDDY, SCIENCE AND HEALTH WITH KEY TO THE SCRIPTURES (1991). Thus, the statutes here delegate the initial "diagnosis" of medical status to untrained laypersons who deny the reality of medical need. This is beyond foolhardy.

Second, while the statutory scheme allows for administrative review of the RNHCI's initial determination, such review is constrained. For example, the statutes provide that the Secretary cannot require "any patient of [an RNHCI] to undergo medical screening, examination, diagnosis, prognosis, or treatment or to accept any other medical health care service, if such patient . . . objects thereto on religious grounds," 42 U.S.C. 1395x(ss)(3)(A)(i), and the Secretary cannot subject an RNHCI or its personnel "to any medical supervision, regulation, or control, insofar as such supervision, regulation, or control would be contrary to [their] religious beliefs . . . ." 42 U.S.C. 1395x(ss)(3)(B)(i). The majority's reliance on the umbrella provisions of 42 U.S.C. §1395x(ss)(3)(A)(ii) and (B)(ii), which allow the Secretary to require "sufficient information" regarding an individual's condition and to review such information to the extent necessary to determine coverage, is an Olympian leap of

faith.[12] Saying both that you cannot require medical analysis and that, despite this, the Secretary can demand sufficient evidence to make a medical determination, seems insincere at best.

The review provided under the Medicare and Medicaid statutes is illusory. In effect, section 4454 vests significant interpretive governmental powers in a group based on their specific religious sect. Such delegation violates the third prong of Lemon.

## III.   CONCLUSION

Accommodation of religion can aid in negotiating the line between the twin First Amendment Clauses of Free Exercise and Establishment. However, accommodation is not a principle without limits. Section 4454 violates the fundamental principle of neutrality underlying the Establishment Clause and cannot stand as a permissive accommodation. Consequently, I respectfully dissent.

I would vacate the order granting summary judgment for the Defendants-Appellees and grant the motion for summary judgment on behalf of Plaintiffs-Appellants on the ground that section 4454 is on its face unconstitutional.

---

[12]This leap of faith is all the more problematic when one considers the recent history of the statutory scheme, which reveals that there has been departmental deference to the Christian Science Sanatoria decision-making. See Affidavit of Jenean Erickson, quoting the Medicare Christian Science Sanatorium Hospital Manual Supplement: "While the intermediary has the final responsibility for assuring that all coverage requirements are met, decisions of the sanatorium's utilization review committee with respect to questions of necessity for sanatorium services will be accorded great weight." (App. at 223).

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.